Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joshua D. Smith, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company
and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                                 Plaintiffs,

-against-

EMOTE MEDICAL SERVICES, P.C., PITCH MEDICAL
P.C., and SANGEET KHANNA, M.D.

                                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:_____ (        )

**Plaintiff Demands a Trial
by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against defendants, Emote Medical Services, P.C., Pitch Medical P.C. and Sangeet Khanna, M.D. (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1.3 million Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-

fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including psychological examinations and testing, transcranial doppler studies, extracorporeal shockwave therapy, and dry-needling (collectively the "Fraudulent Services"), that allegedly were provided to individuals who claimed to have been involved in automobile accidents and eligible for coverage under GEICO no-fault policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $2.1 million in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Emote Medical Services, P.C., Pitch Medical P.C., and Sangeet Khanna, because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)      in many cases, the Fraudulent Services never were provided in the first instance;

(iii)      the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)      the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and others; and

(v)      The Fraudulent Services were provided by independent contractors, rather than by employees of the billing providers, and, therefore, were not reimbursable under New York law.

3.      The Defendants fall into the following categories:

(i)      Defendants Emote Medical Services, P.C. ("Emote Medical") and Pitch Medical P.C. ("Pitch Medical") are New York professional medical corporations through which the Fraudulent Services purportedly were performed and billed to automobile insurance companies, including GEICO.

(ii)    Defendant Sangeet Khanna, M.D. ("Khanna") is a physician licensed to practice medicine in New York, purported to own Emote Medical and Pitch Medical, and purported to perform many of the Fraudulent Services submitted through Emote Medical, Pitch Medical, and Khanna's personal tax identification number ("Khanna Medical").

4.    As discussed herein, the Defendants at all relevant times have known that:

(i)    the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and others; and

(v)    The Fraudulent Services were provided by independent contractors, rather than by employees of the billing providers, and therefore were unreimbursable under New York law.

5.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Emote Medical, Pitch Medical, and Khanna Medical (collectively, the "Providers").

6.    The charts annexed hereto as Exhibits "1" – "3" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

7.    The Defendants' fraudulent scheme began as early as 2020 and has continued uninterrupted since that time.

8.    As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1.3 million.

## THE PARTIES

### I.   Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

### II.   Defendants

10.     Defendant Emote Medical is a New York professional medical corporation with its principal place of business in New York. Emote Medical was formed in New York on August 1, 2011. Emote Medical is purportedly owned by Khanna and was used – along with Pitch Medical and Khanna Medical – as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

11.     Defendant Pitch Medical is a New York professional medical corporation with its principal place of business in New York. Pitch Medical was formed in New York on March 10, 2022. Pitch Medical is purportedly owned by Khanna and was used – along with Emote Medical and Khanna Medical – as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

12.     Defendant Khanna resides in and is a citizen of New York. Khanna was licensed to practice medicine in New York on May 1, 2009.  Khanna purported to own Emote Medical, Pitch Medical, and Khanna Medical, and purported to perform many of the Fraudulent Services on behalf of the Providers.

4

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

14.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

15.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

17.     GEICO underwrites automobile insurance in New York and New Jersey.

**I.     Pertinent New York Law Governing No-Fault Insurance Reimbursement**

18.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

19.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance ("Personal Injury Protection" or "PIP") benefits to Insureds.

20.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

21.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

22.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

23.     In the alternative, in New York a healthcare services provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

24.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

26.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

27.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients to healthcare practices in which they have an

ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

28.    What is more, with limited exceptions that are not applicable here, New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients for electrodiagnostic testing to healthcare practices in which they have an ownership interest, whether or not the healthcare services providers disclose their ownership interest to the patient. See New York Public Health Law § 238-a.

29.    Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it engages in illegal self-referrals.

30.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

31.    Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits. There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

32.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

33.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

34.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

35.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

36.     Beginning in 2020, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other New York automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

### A.    The Multidisciplinary Clinics and Kickbacks

37.     Khanna, Emote Medical, Pitch Medical, and Khanna Medical did not advertise or market the Providers' services to the public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide the Fraudulent Services.

38.     Instead, the Providers operated on an itinerant basis from a large number of multidisciplinary clinics located throughout the New York area (the "Clinics") that purported to provide treatment to patients with no-fault insurance, including but not limited to Clinics at the following locations:

(i)      4250 White Plains Road, Bronx, New York

(ii)     1735 Pitkin Avenue, Brooklyn, New York

(iii)    3250 Westchester Avenue, Bronx, New York

(iv)     430 West Merrick Road, Valley Stream, New York

(v)      513 Church Avenue, Brooklyn, New York

(vi)     9016 Sutphin Boulevard, Jamaica, New York

(vii)    3910 Church Avenue, Brooklyn, New York

(viii)   204-12 Hillside Avenue, Jamaica, New York

(ix)     1611B East New York Avenue, Brooklyn, New York

(x)      381 Rockaway Avenue, Brooklyn, New York

(xi)     360A West Merrick Road, Valley Stream, New York

(xii)    1100 Pelham Parkway, Bronx, New York

(xiii)   665 Pelham Parkway, Bronx, New York

(xiv)    1122 Coney Island Avenue, Brooklyn, New York

(xv)     632 Utica Avenue, Brooklyn, New York

(xvi)    318 Seguine Avenue, Staten Island, New York

(xvii)   150 Graham Avenue, Brooklyn, New York

(xviii)  97-08 Springfield Boulevard, Jamaica, New York

(xix)    150 Lenox Road, Brooklyn, New York

(xx)     108-25 Merrick Boulevard, Jamaica, New York

39.     Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these Clinics were actually organized to supply convenient, one-stop shops for no-fault insurance fraud.

40.     The Providers gained access to the Clinics by paying kickbacks to other healthcare services providers (the "Referring Providers") who operated from the Clinics and controlled access to the Clinics.

41.     The kickbacks to the Clinics were disguised as ostensibly legitimate fees to "lease" space or personnel at the Clinics. In fact, these were "pay-to-play" arrangements that caused the Referring Providers at the Clinics to provide access to Insureds and to refer the Insureds to the Defendants for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

42.     In keeping with the fact that the "rent" that the Providers paid to the Referring Providers constituted kickbacks in exchange for patient referrals, the purported "rent" was far in excess of the fair market value of the putative leaseholds.

43.     In exchange for these kickbacks from the Providers, the Referring Providers automatically referred Insureds to the Defendants for the medically useless Fraudulent Services, regardless of the Insureds' individual circumstances or presentation.

**B.      The Defendants' Fraudulent Treatment and Billing Protocol**

44.     Virtually all the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

45.     Even so, the Defendants purported to subject virtually every Insured to a substantially identical, medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed to maximize the billing that they could submit through the Providers to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

46.     The Defendants purported to provide their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms, presentation, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

47.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

48. No legitimate physician or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

49. The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.     The Fraudulent Charges for Initial Psychiatric Evaluations and Record Evaluations at Emote Medical**

50. Once an Insured was referred to Khanna and Emote Medical or Pitch Medical as a result of the illegal referral arrangements with the Clinics, Khanna purported to provide the Insured with an "Initial Psychiatric Evaluation", and, in virtually all cases, purported to conduct a review of the patient's hospital records or other medical data.

51. The initial psychiatric evaluation was then billed to GEICO through Emote Medical and/or Pitch Medical using CPT code 90792, and typically resulting in a charge of $307.19 separate and independent of the other psychological services that the Insured purportedly received.

52. The initial psychiatric evaluations were conducted, to the extent that they were conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics.

53. In the initial psychiatric evaluation reports that the Defendants submitted in support of their billing for virtually every Insured, the Defendants virtually always reported a boilerplate "diagnosis" of "anxiety disorder", "adjustment disorder", or "pain disorder" as the result of trauma incurred during an automobile accident.

54.     Moreover, virtually every initial report submitted by the Defendants consisted of a two or three-page checklist that provided minimal information about a patient's psychological health or history.

55.     Not only did the Defendants submit improper billing for the initial psychiatric evaluations, they also "unbundled" the charges in virtually every instance in order to maximize the billing they could submit, or cause to be submitted, to GEICO.

56.     For instance, for virtually every Insured, on the same dates that they submitted charges for the initial psychiatric evaluations, the Defendants submitted separate charges of $98.86 using CPT code 90885. The use of CPT code 90885 represents that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." The Defendants submitted these charges to GEICO despite the fact that review and evaluation of the Insureds' medical and psychological records was necessary to, and already was reimbursed as an element of, the Insureds' initial psychiatric evaluations. In other words, Defendants cannot conduct and bill for an initial psychiatric evaluation, then bill separately for contemporaneously-provided medical or psychological record reviews.

57.     Furthermore, the Defendants' charges using CPT code 90885 for record review and evaluation misrepresented the performance of the service because no psychiatrist, nor any other mental health professional associated with Emote Medical or Pitch Medical, ever actually reviewed or evaluated any records to support the charges.

58.     The conclusion that neither Khanna, nor any other mental health professional associated with Emote Medical or Pitch Medical, ever reviewed any records to support the charges billed using CPT code 90885 is confirmed by the fact that the "reports" accompanying the bills never indicated what records were actually reviewed.

**2.      The Fraudulent Charges for Psychological Testing at Emote Medical and Pitch Medical**

59.      On the same date that Insureds were purportedly given an initial psychiatric evaluation, Khanna and Emote Medical or Pitch Medical purported to provide those same Insureds with a battery of needless psychological tests.

60.      Khanna and Emote Medical or Pitch Medical systemically caused the psychological testing to be billed to GEICO using CPT codes 96101, typically for 4 hours of testing at a rate of $241.43 per hour, 96116, typically for 1 hour at a rate of $303.21, and 96118, typically for 2 hours of testing at a rate of $327.56 per hour.  In short, the billing represented that seven (7) hours of testing was performed on the Insured on the same day.  This resulted in routine charges of $2,044.08 per round of testing per Insured.

61.      The psychological testing was unnecessary, and conducted, to the extent it was conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics.

62.      Moreover, in actuality, the tests were merely a handful of pre-printed checklists and inventories that automatically were distributed to the Insureds by the front-desk receptionists at the Clinics pursuant to the financial payments made by Defendants to the Clinics. The Insureds were then invited to check off the psychological symptoms they purportedly were experiencing. Neither Khanna, nor any other mental health professional engaged in any independent assessment of any Insured's discrete symptoms or presentation before the Insureds were handed the psychological tests.  The charges for the psychological testing therefore were fraudulent inasmuch as the testing was performed, to the extent it was performed at all, pursuant to a predetermined treatment protocol.

63.     In keeping with this predetermined treatment protocol, the Defendants purported to provide an identical battery of psychological tests to virtually every Insured, without regard for their individual circumstances or presentation. Specifically, in virtually every case where a diagnostic interview was conducted, the Defendants purported to provide virtually every Insured with an array of psychological tests, including the following:

(i)     Beck Anxiety Inventory ("BAI") – a twenty-one question self-report used to evaluate the symptoms of anxiety. A BAI typically takes ten to fifteen (10-15) minutes to administer.

(ii)    Beck Depression Inventory – II ("BDI") – a twenty-one question self-report used to evaluate the symptoms of depression. A BDI typically takes ten to fifteen (10-15) minutes to administer.

(iii)   Beck Hopelessness Scale ("BHS") – a set of 10-20 questions that the patient answers true/false to determine their mental state with regards to thought about future, motivation and expectations. A BHS typically takes ten to fifteen (10-15) minutes to administer.

(iv)    Pain Disability Index ("PDI") – a two-page self-report or interview used to assess the severity of and the impact of pain on daily functions. A PSI typically takes approximately five (5) minutes to administer.

(v)     Psychological Inflexibility Scale (PIPS) – a 16-item questionnaire that a patient answers, using a scale of 1-7, and used to assess psychological inflexibility in people with chronic pain. A PIPS typically takes approximately five to ten (5-10) minutes to administer.

(vi)     Primary Care PTSD Screen (PC-PTSD) – a 5-item questionnaire designed to identify individuals with probable PTSD in the primary care settings. A PC-PTSD typically takes 5-10 minutes to administer

(vii)   Short Blessed Test (SBT) – a 6-item questionnaire designed to identify memory and concentrations issues. An SBT typically takes approximately 3 minutes to administer.

(viii)  General Anxiety Disorder Assessment (GAD-7) – a 7-item questionnaire designed to identify individuals with general anxiety disorder.

(ix)    Psychological Health Questionnaire (PHQ-9) a 9-item questionnaire designed to identify individuals with depression.

(x)     Brief Interview for Mental Status (BIMS) – a 7-item questionnaire designed to assess a patient's cognitive function.

(xi)     Neurobehavioral Symptom Inventory (NSI) – a two-page self-report designed to track neurobehavioral symptoms over time.

(xii)    Tobacco Abuse Screen – 2-item questionnaire designed to identify tobacco abuse.

(xiii)   Alcohol Abuse Screen – a 2-item questionnaire designed to identify alcohol abuse.

64.     Furthermore, the Defendants' charges for the psychological testing were fraudulent because, notwithstanding the Defendants' misrepresentations that the tests virtually always took seven (7) hours to perform, the tests generally never took more than ninety (90) minutes to administer, score, and interpret, to the extent that they were performed in the first instance.

65.     For example, and as set forth above, the "psychological testing" virtually always consisted of nothing more than a packet of pre-printed checklists and inventories that were automatically distributed to the Insureds by the front desk receptionists at the Clinics, and which the Insureds typically filled out before Khanna, or any other mental health practitioner associated with the Defendants.

66.     In keeping with the fact that the Defendants misrepresented the amount of time that it took to conduct the putative psychological testing, on several individual dates of service, Khanna frequently purported to personally perform more than 20 hours of "psychological testing" services on GEICO Insureds on a single given day, often at multiple Clinics.

67.     For example:

(i)      On July 22, 2020, Khanna and Emote Medical purported to provide – and bill for – at least 24 hours of psychological testing services to at least eight individual Insureds at a Clinic located at 5127 Queens Boulevard, 2nd Floor, Woodside, New York.

(ii)     On July 7, 2021, Khanna and Emote Medical purported to provide – and bill for – at least 24 hours of psychological testing services to at least eight individual Insureds at a Clinic located at 4250 White Plains Road, Bronx, New York.

16

(iii)    On November 2, 2021, Khanna and Emote Medical purported to provide – and bill for – at least 32 hours of psychological testing services to at least ten individual Insureds at two separate clinics: 175-20 Hillside Avenue, Jamaica, New York and 2488 Grand Concourse, Bronx, New York.

(iv)    On October 25, 2021, Khanna and Emote Medical purported to provide – and bill for – at least 45 hours of psychological testing services to at least eight individual Insureds at three separate clinics: 4250 White Plains Road, Bronx, New York, 360A W. Merrick Road, Valley Stream, New York, and 2488 Grand Concourse, Bronx, New York.

(v)    On December 20, 2021, Khanna and Emote Medical purported to provide – and bill for – at least 24 hours of psychological testing services to at least eight individual Insureds at a Clinic located at 129 Livingston Street, Suite 3, Brooklyn, New York.

(vi)    On January 25, 2022, Khanna and Emote Medical purported to provide – and bill for – at least 30 hours of psychological testing services to at least nine individual Insureds at two separate clinics: 129 Livingston Street, Suite 3, Brooklyn, New York and 1674 E 22nd Street, Suite 2, Brooklyn, New York.

(vii)    On February 15, 2022, Khanna and Emote Medical purported to provide – and bill for – at least 26 hours of psychological testing services to at least six individual Insureds at four separate clinics: 4250 White Plains Road, Bronx, New York, 51-27 Queens Boulevard, Woodside, New York, 9801 Foster Avenue, Brooklyn, New York, and 2488 Grand Concourse, Bronx, New York.

(viii)    On February 22, 2022, Khanna and Emote Medical purported to provide – and bill for – at least 39 hours of psychological testing services to at least seven individual Insureds at two separate clinics: 175-20 Hillside Avenue, Jamaica, New York and 9801 Foster Avenue, Brooklyn, New York.

(ix)    On March 2, 2022, Khanna and Emote Medical purported to provide – and bill for – at least 27 hours of psychological testing services to at least four individual Insureds at two separate clinics: 1735 Pitkin Avenue, Brooklyn, New York and 108 Kenilworth Place, Brooklyn, New York.

(x)    On March 25, 2022, Khanna, Emote Medical, and Pitch Medical purported to provide – and bill for – at least 21 hours of psychological testing services to at least seven individual Insureds at two separate clinics: 1735 Pitkin Avenue, Brooklyn, New York and 486 McDonald Avenue, Brooklyn, New York.

(xi)  On April 12, 2022, Khanna, Emote Medical, and Pitch Medical purported to provide – and bill for – at least 24 hours of psychological testing services to at least eight individual Insureds at four separate clinics: 1735 Pitkin Avenue, Brooklyn, New York, 51-27 Queens Boulevard, Woodside, New York, 9801 Foster Avenue, Brooklyn, New York, and 1735 Pitkin Avenue, Brooklyn, New York.

(xii)  On April 19, 2022, Khanna, Emote Medical, and Pitch Medical purported to provide – and bill for – at least 42 hours of psychological testing services to at least fourteen individual Insureds at three separate clinics: 175-20 Hillside Avenue, Jamaica, New York, 2488 Grand Concourse, Bronx, New York, and 108 Kenilworth Place, Brooklyn, New York.

68.  These are only representative examples.

69.  In the claims identified in Exhibits "1" and "2", Khanna routinely purported to perform an impossible volume of psychological testing services on a single date through Emote Medical and/or Pitch Medical, frequently at multiple different Clinics. In many cases, Khanna also purported to provide other services, including VNG/CDP, TCDS, ESWT, and dry-needling, to the Insured on the very the same days he purported to provide an impossible volume of psychological testing.

70.  Furthermore, upon information and belief, the fraudulent billing for psychological testing that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for psychological testing services that the Defendants submitted to the entire New York automobile insurance industry.

71.  It is extremely improbable, to the point of impossibility, that the Defendants only treated GEICO Insureds or submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other New York automobile insurers.

72.  Thus, upon information and belief, the impossible number of psychological testing services that the Defendants purported to perform on GEICO Insureds at the Clinics on individual dates of service constituted only a fraction of the total number of psychological testing services

that Khanna purported to perform at the Clinics, including on individuals insured by companies other than GEICO.

73.     The Defendants' charges for the psychological testing also routinely misrepresented that Khanna prepared genuine, written reports interpreting the test results. Specifically, according to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 96101 represents that the treating psychologist has prepared a written report interpreting the psychological test results.

74.     Khanna never prepared a written report interpreting the psychological test results. Rather, the Defendants simply cobbled the psychological testing reports together using boilerplate language from preexisting reports, without any interpretive input from Khanna or any or mental health professional.

75.     In fact, virtually every psychological testing report submitted by the Defendants in support of Emote Medical or Pitch Medical's billing contained language that was duplicated across Insureds' reports. Only the Insureds' respective background information and "psychological test" scores were unique to any particular patient. In particular, and as set forth above, virtually every psychological testing report resulted in a verbatim recommendation for psychotherapy, as well as a verbatim description of what that course of psychotherapy would entail:

> Treatment Recommendations:   [Name of Insure] should receive Supportive Psychotherapy utilizing Cognitive Therapy and/or Biofeedback, at least once a week in order to cope with his with disability and regulate pain levels.

76.     Virtually every boilerplate "psychological test report" generated by the Defendants concluded with a false, predetermined "diagnosis" as the result of trauma incurred during an automobile accident. The Insureds received these phony "diagnoses" regardless of their individual circumstances or unique presentation. In actuality, the vast majority of Insureds did not suffer from

any other legitimate psychological problems as the result of the minor automobile accidents they supposedly experienced.

77.     Neither Khanna, nor any other mental health professional associated with Emote Medical or Pitch Medical, ever reviewed the results of the psychological testing, or altered any Insured's treatment plan based upon the results of the testing. Indeed, as set forth above, regardless of any individual Insureds purported test scores, virtually every Insured received the same boilerplate treatment plan.

78.     Moreover, the Defendants' purported use of psychological tests, to the extent that they actually provided the tests in the first instance, stands in marked contrast to the standard of care in basic, legitimate psychological practice. For instance, under generally accepted standards and practices, a diagnostic interview examination alone should be sufficiently comprehensive to address all of the issues discernable from the types of self-reporting psychological tests that Khanna, Emote Medical, and Pitch Medical purported to provide. Psychological testing of the kind allegedly administered by Khanna would only be necessary when a diagnosis is not evident from a diagnostic interview. In those instances where a diagnosis is not evident from a diagnostic interview, psychological testing would be indicated to clarify the diagnosis. It is unlikely, to the point of impossibility, that every case would be so diagnostically challenging as to warrant hours of psychological testing. In fact, the Fee schedule acknowledges that "Psychological testing should not be used routinely."

79.     Virtually every Insureds received the same recommendations regardless of their findings of their mental status exam and regardless of the purported results of psychological testing.

80.     Neither Khanna, nor or any other mental health professional ever legitimately reviewed the results of the psychological testing or legitimately created or altered any Insured's

treatment plan based upon the results of the testing.  Indeed, as set forth above, regardless of any individual Insureds purported test scores, every Insured received the same boilerplate treatment plan but less than forty percent (40%) of the Insureds actually received any follow-up psychological treatment and care.

### 3. The Fraudulent Charges for Videonystagmography and Computerized Dynamic Posturography

81.     The Defendants purported to subject many Insureds to medically unnecessary videonystagmography ("VNG") tests and computerized dynamic posturography ("CDP") tests.

82.     The charges for the VNG and CDP tests (collectively "VNG/CDP") were fraudulent in that the VNG/CDP tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks the Defendants paid that allowed the Defendants access to the Clinics' patients.

83.     Emote Medical and Pitch Medical billed the VNG/CDP to GEICO using CPT codes 92537, 92540, 92546, 92547, and 92548 generally resulting in charges of $666.34 for each VNG/CDP test it purported to provide.

#### a.     Legitimate Uses for VNG/CDP Tests

84.     VNG/CDP tests consist of tests that can be used to determine the cause of a patient's vertigo or balance disorder in cases where there are no readily recognizable contributing factors to the patient's condition.

85.     In other words, VNG/CDP tests are not used to confirm the existence of dizziness or a balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ENT or neurological medical examination. Generally, VNG/CDP tests are employed to determine the source of the generation of vertigo, i.e., the inner ear or brain.

21

86.     VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras.  The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

87.     There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see how the eyes move, which helps the physician assess the patient's vertigo, which in turn helps the physician assess the source of imbalance.

88.     To properly administer a VNG test, the patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants such as caffeine, as well as alcohol; and three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine – among other things – the nature of the problematic symptoms and the patient's eye movements.

89.     VNGCDP tests should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma.  A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a physical examination, including an ENT and neurological examination, followed by conservative care absent evidence of a more serious condition, e.g., a brain tumor. If the patient does not respond

to conservative care, an MRI of the brain may be ordered. If a patient does not respond to conservative care, and the brain MRI is negative, the patient may be evaluated by an ENT or neurologist to determine if VNG/CDP is warranted. Virtually none of the Insureds were referred to the Providers by an ENT or a neurologist, the vast majority did not undergo conservative care prior to undergoing VNG/CDP testing with the Providers, and virtually none received a brain MRI prior to undergoing the VNG/CDP testing with the Providers.

### b.   The Defendants' Fraudulent VNG/CDP Test Charges

90.    Emote Medical and Pitch Medical did not perform independent evaluations on Insureds to determine if the VNG/CDP testing was medically necessary.

91.    Instead, the Defendants performed the VNG/CDP testing pursuant to unlawful referrals issued by the Referring Providers as part of a pre-determined protocol.

92.    To the extent the Referring Providers conducted medical examinations that assessed the Insureds' neurological symptoms, virtually none of the Insureds who received VNG/CDP testing from the Providers reported experiencing dizziness, imbalance, or vertigo in the examination reports that preceded the VNG/CDP testing.

93.    In even more egregious cases, the patent histories and examinations documented in the Referring Providers' examination reports directly contradicted the need for the VNG/CDP tests, nevertheless the Defendants subjected the Insureds to multiple rounds of testing.

94.    For example:

    (i)    On February 28, 2021, an Insured named Ashley Maiorana was purportedly involved in a motor vehicle accident. On March 10, 2021, AM sought treatment with Back to Health Chiropractic and Anthony Mandracchia, D.C. ("Mandracchia") at the Clinic located at 6659 Amboy Road, Staten Island, New York. At that visit, Mandracchia did not document any dizziness, vertigo, or tinnitus. Nevertheless, on August 18, 2021, AM underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Mandracchia.

(ii)    On July 24, 2021, an Insured named Peyton Atteloney was purportedly involved in a motor vehicle accident. On August 2, 2021, PA sought treatment at the Clinic located at 243 Merrick Boulevard, Rosedale, New York. On August 10, 2021, PA underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Phyllis Gelb, M.D. ("Gelb") despite the lack of any documentation by Gelb of dizziness, vertigo, or tinnitus.

(iii)    On May 21, 2021, an Insured named Juan Reyes was purportedly involved in a motor vehicle accident. On July 29, 2021, JR sought treatment with Spine Care Chiropractic PC and Chung Jae, D.C. ("Jae") at the Clinic located at 552 East 180th Street, Bronx, New York. At that visit, Jae did not document any dizziness, vertigo, or tinnitus. Nevertheless, on July 22, 2021, JR underwent VNG/CDP with Emote Medical purportedly pursuant to a referral from Jae.

(iv)    On June 12, 2021, an Insured named Richard Brown was purportedly involved in a motor vehicle accident. On June 22, 2021, RB sought treatment at the Clinic located at 2167 East 21st Street, Brooklyn, New York. On July 21, 2021, RB underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Elliot Strauss, D.C. ("Strauss") despite the lack of any documentation by Strauss of dizziness, vertigo, or tinnitus.

(v)    On June 12, 2021, an Insured named Richard Brown was purportedly involved in a motor vehicle accident. On June 22, 2021, RB sought treatment at the Clinic located at 2167 East 21st Street, Brooklyn, New York. On July 21, 2021, RB underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Strauss despite the lack of any documentation by Strauss of dizziness, vertigo, or tinnitus.

(vi)    On April 25, 2021, an Insured named Menachem Itzchaki was purportedly involved in a motor vehicle accident. On June 2, 2021, MI sought treatment at the Clinic located at 1850 Ocean Parkway, Brooklyn, New York. On August 11, 2021, MI underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Strauss despite the lack of any documentation by Strauss of dizziness, vertigo, or tinnitus.

(vii)    On April 25, 2021, an Insured named Menachem Itzchaki was purportedly involved in a motor vehicle accident. On June 2, 2021, MI sought treatment at the Clinic located at 1850 Ocean Parkway, Brooklyn, New York. On August 11, 2021, MI underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Strauss despite the lack of any documentation by Strauss of dizziness, vertigo, or tinnitus.

(viii)    On April 25, 2021, an Insured named Jayson Yunatanov was purportedly involved in a motor vehicle accident. On April 26, 2021, JY sought treatment at the Clinic located at 1674 East 22nd Street, Brooklyn, New York. On August 11, 2021, JY underwent VNG/CDP with Emote Medical

pursuant to a referral purportedly from Strauss despite the lack of any documentation by Strauss of dizziness, vertigo, or tinnitus.

(ix)     On July 10, 2021, an Insured named Rosalino Gonzalez was purportedly involved in a motor vehicle accident. On July 12, 2021, RG sought treatment at the Clinic located at 210 Finley Avenue, Staten Island, New York. On July 13, 2021, RG underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Aleksandr Kophach, P.A. despite the lack of any documentation by Kopach of dizziness, vertigo, or tinnitus.

(x)      On June 30, 2021, an Insured named Charles Jean-Paul was purportedly involved in a motor vehicle accident. On June 30, 2021, CJP sought treatment with Tri-Brorough NY Medical Practice PC and Inna Letvenko, N.P. ("Letvenko") at the Clinic located at 9016 Sutphin Boulevard, Jamaica, New York. At that examination, Letvenko did not document any dizziness, vertigo, or tinnitus. Nevertheless, on August 18, 2021, CJP underwent VNG/CDP with Emote Medical pursuant to a referral purportedly from Letvenko.

(xi)     On December 19, 2021, an Insured named Samiqua Peterson was purportedly involved in a motor vehicle accident. On February 10, 2022, SP sought treatment with Ace Emergent Medical Care. P.C. and Christian Bannerman, M.D. ("Bannerman") at the Clinic located at 108-25 Merrick Boulevard, Jamaica, New York. At that examination, Bannerman did not document any dizziness, vertigo, or tinnitus. Nevertheless, on April 5, 2022, SP underwent VNG/CDP with Pitch Medical pursuant to a referral purportedly from Bannerman.

(xii)    On March 27, 2022, an Insured named Lucio Castro was purportedly involved in a motor vehicle accident. On March 31, 2022, LC sought treatment with Macintosh Medical, P.C. and Carlotta Ross-Distin, RPA-C ("Ross-Distin") at the Clinic located at 3626 Bailey Avenue, Bronx, New York. At that examination, Ross-Distin did not document any dizziness, vertigo, or tinnitus. Nevertheless, on April 12, 2022, LC underwent VNG/CDP with Pitch Medical pursuant to a referral purportedly from Macintosh Medical.

(xiii)   On November 16, 2021, an Insured named Nancy Perry was purportedly involved in a motor vehicle accident. On February 24, 2022, NP sought treatment at the Clinic located at 3000 Eastchester Road, Bronx, New York. On April 7, 2022, NP underwent VNG/CDP with Pitch Medical. In keeping with the fact that there was no medical basis for VNG/CDP, nor a legitimate referral for VNG/CDP, the resulting VNG/CDP report failed to identify a referring physician. Nevertheless, the medical professionals that did examine NP failed to document any dizziness, vertigo, or tinnitus.

(xiv)    On March 4, 2022, an insured named Yimys Balencia was purportedly involved in a motor vehicle accident. On March 16, 2022, YB sought

treatment with Tri-Brorough NY Medical Practice PC and Julie Saint Jean, N.P. ("Saint Jean") at the Clinic located at 82-17 Woodhaven Boulevard, Ridgewood, New York. At that examination, Saint Jean did not document any dizziness, vertigo, or tinnitus. On April 4, 2022, YB underwent VNG/CDP with Pitch Medical pursuant to a referral purportedly from "Jean Gibson" or "Gibs, Jean." There is no indication in the billing submitted to GEICO that anyone named "Jean Gibson" or "Gibs, Jean" ever even examined YB, much less referred them for VNG/CDP with Pitch Medical.

(xv)     On March 1, 2022, an Insured named Kurt Allen was purportedly involved in a motor vehicle accident. On March 3, 2022, KA sought treatment at the Clinic located at 150 Lenox Road, Brooklyn, New York. On April 5, 2022, KA underwent VNG/CDP with Pitch Medical. In keeping with the fact that there was no medical basis for VNG/CDP, nor a legitimate referral for VNG/CDP, the resulting VNG/CDP report failed to identify a referring physician. Nevertheless, the medical professionals that did examine KA failed to document any dizziness, vertigo, or tinnitus.

95.     These are only representative examples.

96.     In virtually all the claims identified in Exhibits "1" and "2", the Insureds who received VNG/CDP testing with the Providers did so despite exhibiting no dizziness, vertigo, tinnitus, or gait abnormalities.

97.     Although virtually none of the Insureds who received VNG/CDP displayed symptoms warranting the testing, the Defendants submitted, or caused to be submitted, hundreds of thousands of dollars in bills for VNG/CDP to GEICO, as part of the Fraudulent Services.

98.     Moreover, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident. These variables include, but are not limited to, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact.

99.     It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident would routinely require VNG/CDP testing at or about the same time.

100.    Even so, and in keeping with the fact that the VNG/CDP testing purportedly performed by the Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Defendants routinely provided VNG/CDP testing to multiple Insureds involved in the same accident at or about the same time.

101.    Emote Medical and Pitch Medical routinely provided VNG/CDP testing to multiple Insureds involved in the same accident at or about the same time as follows:

   (i)     On April 25, 2021, two insureds – Jason Yunatanov and Menachem Itzchaki - were involved in the same automobile accident. Thereafter, JY and MI both - incredibly - received VNG/CDP from Emote Medical on August 11, 2021.

   (ii)    On June 15, 2021, two insureds – Daniel Quinones and Yvonne Calderon - were involved in the same automobile accident. Thereafter, DQ and YC both - incredibly - received VNG/CDP from Emote Medical on July 12, 2021.

   (iii)   On June 27, 2021, two insureds – Rocco Papapietro and Taylor Krupa- were involved in the same automobile accident. Thereafter, RP and TK both - incredibly - received VNG/CDP from Emote Medical on August 4, 2021.

   (iv)    On July 17, 2021, two insureds – Travis Joseph and Orson Thomas - were involved in the same automobile accident. Thereafter, TJ and OT both - incredibly - received VNG/CDP from Emote Medical on July 28, 2021.

   (v)     On May 22, 2021, two insureds – Kadijah Hicks and Devale Johnson - were involved in the same automobile accident. Thereafter, KH and DJ both - incredibly - received VNG/CDP from Emote Medical on July 19, 2021.

   (vi)    On June 4, 2021, two insureds – Rosana Candelario and Pascual Busanet - were involved in the same automobile accident. Thereafter, RC and PB both - incredibly - received VNG/CDP from Emote Medical on July 14, 2021.

   (vii)   On May 16, 2021, two insureds – Louis Duplan and Reginald Andre - were involved in the same automobile accident. Thereafter, LD and RA both - incredibly - received VNG/CDP from Emote Medical on August 9, 2021.

   (viii)  On June 30, 2021, three insureds – Alexandra Valdiviezo, Allan Valdiviezo, and Gustavo Valdiviezo - were involved in the same automobile accident. Thereafter, AV, AV, and GV all - incredibly - received VNG/CDP from Emote Medical on July 13, 2021.

(ix)    On July 2, 2021, two insureds – Linnette Bowes and Lidia Dundas - were involved in the same automobile accident. Thereafter, LB and LD both - incredibly - received VNG/CDP from Emote Medical on August 16, 2021.

(x)    On July 16, 2021, two insureds – Carolyn Paloma and William Paloma - were involved in the same automobile accident. Thereafter, CP and WP both - incredibly - received VNG/CDP from Emote Medical on July 22, 2021.

(xi)    On November 17, 2021, two insureds – Aslyn Gomez and Jose Joseph - were involved in the same automobile accident. Thereafter, AG and JJ both - incredibly - received VNG/CDP from Pitch Medical on April 4, 2022.

(xii)    On March 4, 2021, two insureds – Yimys Balencia and Jorge Corozo - were involved in the same automobile accident. Thereafter, YB and JC both - incredibly - received VNG/CDP from Pitch Medical on April 4, 2022.

(xiii)    On April 1, 2021, two insureds – Vaniesha Wilson and Shateek Cargo - were involved in the same automobile accident. Thereafter, VW and SC both - incredibly - received VNG/CDP from Pitch Medical on April 6, 2022.

(xiv)    On March 19, 2022, two insureds – Felicia Rogucki and Delisha Weaver - were involved in the same automobile accident. Thereafter, FR and DW both - incredibly - received VNG/CDP from Pitch Medical on April 6, 2022.

(xv)    On March 31, 2022, three insureds – Viscount Cumberbatch, Michelle Walker, and Chenessa Alston - were involved in the same automobile accident. Thereafter, VC, MW, and CA all - incredibly - received VNG/CDP from Pitch Medical on April 6, 2022.

102.    These are only representative examples.

103.    In many of the claims identified in Exhibits "1" and "2", two or more Insureds involved in the same underlying accident received VNG/CDP testing from the Defendants at or about the same time, despite the fact that the Insureds were differently situated.

104.    Even if an Insured reported the existence of some general form of dizziness or balance disorder, the VNG/CDP tests that supposedly were provided by the Defendants were medically unnecessary because the cause of the Insured's dizziness or imbalance could be identified through the physical examinations that the Referring Providers routinely purported to provide, and the patient histories that they purported to take, during every initial examination/consultation and follow-up examination.

105.    In keeping with the fact that the VNG/CDP tests that supposedly were provided by the Defendants were medically unnecessary, no physician or healthcare provider associated with the Defendants properly prepared the Insureds for the tests or conducted any sort of pre-test evaluation or screening. This, in turn, rendered the data that the Defendants purported to obtain from the tests unreliable and useless.

106.    Because the Defendants knew the VNG/CDP tests were unreliable and useless, the data results that the Defendants purported to obtain from the tests was not incorporated into any Insured's treatment plan. Even when the VNG/CDP tests returned a positive result, the Insureds rarely, if ever, underwent vestibular rehabilitation, balance retraining, or any other therapy to address their putative balance issues.

107.    In further keeping with the fact that the VNG/CDP tests were unreliable and useless, in many instances when the VNG/CDP tests returned inconclusive results, the Insureds did not undergo additional testing to generate conclusive results.

108.    In keeping with the fact that the VNG/CDP tests were medically unnecessary and administered pursuant to a predetermined fraudulent treatment protocol, virtually all the VNG reports contain pre-printed, boilerplate language, stating "patient c/o recurrent episodes of dizziness and headaches" even though virtually none of the patients who treated with the Defendants actually complained of recurrent episodes of dizziness.

109.    In further keeping with the fact that the VNG tests were unreliable and useless, to the extent the Providers generated Infrared/Video ENG Reports as a result of the VNG tests, the Infrared/Video ENG Reports virtually always contained the following pre-printed boilerplate test results:

Summary and Impression: Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

Recommendations: Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

110. Moreover, despite that the reports virtually always recommend balance rehabilitation in the pre-printed recommendations, virtually none of the Insureds who received VNG/CDP testing with the Providers underwent balance rehabilitation.

111. It is clear the VNG/CDP testing was purportedly rendered and then billed to GEICO pursuant to the Defendants' fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

**4.     The Fraudulent Charges for Transcranial Doppler Studies at Emote Medical**

112. The Defendants also purported to subject many Insureds to medically unnecessary transcranial doppler studies ("TCD").

113. The charges for the TCD were fraudulent in that the transcranial doppler tests were medically unnecessary and were performed—to the extent performed at all—pursuant to fraudulent treatment protocols and illegal kickback and referral arrangements.

114. Khanna, Emote Medical, and Pitch Medical then billed the TCD to GEICO using CPT 93886, 93890, and 93892 typically resulting in a charge $1,641.79 for each session of TCD they purported to provide.

**a.     Legitimate Uses for TCD**

115. TCD is an ultrasound technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.

116.     TCD typically uses a Doppler Transducer that enables recording of blood flow velocities from intracranial arteries through selected cranial foramina and thin regions of the skull. Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

117.     TCD obtains information about the physiology of blood flow through the intracranial cerebrovascular system.

118.     Depending on the type of measurement needed, TCD studies can take at least 45 minutes, if not more.

119.     TCD evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

> (i)      Vasospasm, following a ruptured brain aneurysm;
>
> (ii)     Sickle cell anemia, to determine a patient's stroke risk;
>
> (iii)    Ischemic stroke;
>
> (iv)     Intracranial stenosis or blockage of the blood vessels;
>
> (v)      Cerebral microemboli; or
>
> (vi)     Patent Foramen Ovale, a hole in the heart that does not close properly after birth, which may provoke embolic stroke.

120.     The symptomology of the above-named conditions includes sudden severe headache with no known cause; numbness, weakness, or paralysis of the face, arm, leg, or one side of the body; confusion; trouble speaking, seeing, or walking; and/or sudden dizziness, loss of balance, or loss of coordination.

121.     Headaches or dizziness following head trauma are not indications for TCD studies of the intracranial cerebrovascular system.

122.     Moreover, in the event the Insureds did suffer from any such symptoms, the onset of those symptoms was nether sudden nor unexplained but rather a purported result of the motor vehicle accidents that caused them to seek treatment at the No-Fault Clinics in the first instance.

123.     In a legitimate setting, if a medical doctor needs to examine a patient's intracranial blood flow he or she orders a magnetic resonance angiogram ("MR angiogram") or a computed tomography angiogram ("CT angiogram"), both of which measure intracranial blood flow with more accuracy than TCD.

124.     Indeed, there are virtually no clinical indications for TCD in an outpatient setting.

**b.     The Defendants' Fraudulent TCD Charges**

125.     The Defendants did not perform independent evaluations on Insureds to determine whether TCD was medically necessary.

126.     Instead, the Defendants performed the TCD pursuant to referrals from the Referring Providers.

127.     In keeping with the fact that the TCD was performed pursuant to predetermined treatment protocols, the medical examinations performed by the Referring Providers often failed to screen for the symptoms that would warrant TCD.

128.     To the extent the Referring Providers conducted medical examinations that assessed the Insureds' head pain and neurological symptoms, in virtually all cases where the Defendants purported to provide TCD, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant TCD.

129.     Indeed, in keeping with the fact that that TCD was medically useless and performed on a protocol basis rather than to benefit any of the Insureds, the diagnoses generated by the Referring Providers and listed on the Providers' billing to justify the TCD they administered to

Insureds were often directly contradicted by the medical records generated by the Referring Providers.

130.    Despite virtually none of the Insureds who received TCD displaying symptoms warranting the testing, the Defendants submitted, or caused to be submitted, hundreds of thousands of dollars in bills for TCD to GEICO.

131.    Specifically, virtually none of the Insureds who received TCD at Emote Medical reported suffering sudden or unexplained severe headaches, numbness or weakness, confusion, trouble speaking, seeing, or walking, and/or sudden dizziness, loss of balance, and/or coordination.

132.    Moreover, it is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident would routinely require TCD at or about the same time.

133.    Even so, and in keeping with the fact that the TCD purportedly performed by the Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, Khanna, Emote Medical, and Pitch Medical routinely provided TCD to multiple Insureds involved in the same accident at or about the same time.

134.    For example:

 (i)  On April 25, 2021, two insureds – Jason Yunatanov and Menachem Itzchaki - were involved in the same automobile accident. Thereafter, JY and MI both - incredibly - received TCD from Emote Medical on August 11, 2021.

 (ii)  On June 15, 2021, two insureds – Daniel Quinones and Yvonne Calderon - were involved in the same automobile accident. Thereafter, DQ and YC both - incredibly - received TCD from Emote Medical on July 12, 2021.

 (iii)  On June 27, 2021, two insureds – Rocco Papapietro and Taylor Krupa- were involved in the same automobile accident. Thereafter, RP and TK both - incredibly - received TCD from Emote Medical on August 4, 2021.

 (iv)  On July 17, 2021, two insureds – Travis Joseph and Orson Thomas - were involved in the same automobile accident. Thereafter, TJ and OT both - incredibly - received TCD from Emote Medical on July 28, 2021.

(v)     On May 22, 2021, two insureds – Kadijah Hicks and Devale Johnson - were involved in the same automobile accident. Thereafter, KH and DJ both - incredibly - received TCD from Emote Medical on July 19, 2021.

(vi)    On June 4, 2021, two insureds – Rosana Candelario and Pascual Busanet - were involved in the same automobile accident. Thereafter, RC and PB both - incredibly - received TCD from Emote Medical on July 14, 2021.

(vii)   On May 16, 2021, two insureds – Louis Duplan and Reginald Andre - were involved in the same automobile accident. Thereafter, LD and RA both - incredibly - received TCD from Emote Medical on August 9, 2021.

(viii)  On June 30, 2021, three insureds – Alexandra Valdiviezo, Allan Valdiviezo, and Gustavo Valdiviezo - were involved in the same automobile accident. Thereafter, AV, AV, and GV all - incredibly - received TCD from Emote Medical on July 13, 2021.

(ix)    On July 2, 2021, two insureds – Linnette Bowes and Lidia Dundas - were involved in the same automobile accident. Thereafter, LB and LD both - incredibly - received TCD from Emote Medical on August 16, 2021.

(x)     On July 16, 2021, two insureds – Carolyn Paloma and William Paloma - were involved in the same automobile accident. Thereafter, CP and WP both - incredibly - received TCD from Emote Medical on July 22, 2021.

(xi)    On November 17, 2021, two insureds – Aslyn Gomez and Jose Joseph - were involved in the same automobile accident. Thereafter, AG and JJ both - incredibly - received TCD from Pitch Medical on April 4, 2022.

(xii)   On March 4, 2021, two insureds – Yimys Balencia and Jorge Corozo - were involved in the same automobile accident. Thereafter, YB and JC both - incredibly - received TCD from Pitch Medical on April 4, 2022.

(xiii)  On April 1, 2021, two insureds – Vaniesha Wilson and Shateek Cargo - were involved in the same automobile accident. Thereafter, VW and SC both - incredibly - received TCD from Pitch Medical on April 6, 2022.

(xiv)   On March 19, 2022, two insureds – Felicia Rogucki and Delisha Weaver - were involved in the same automobile accident. Thereafter, FR and DW both - incredibly - received TCD from Pitch Medical on April 6, 2022.

(xv)    On March 31, 2022, three insureds – Viscount Cumberbatch, Michelle Walker, and Chenessa Alston - were involved in the same automobile accident. Thereafter, VC, MW, and CA all - incredibly - received TCD from Pitch Medical on April 6, 2022.

135.    These are only representative examples.

34

136.   In many of the claims identified in Exhibit "1" and "2", two or more Insureds involved in the same underlying accident received TCD from Emote Medical or Pitch Medical at or about the same time, despite the fact that the Insureds were differently situated.

137.   As with the other Fraudulent Services, the TCD was rendered and billed pursuant to the Defendants' fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

138.   Indeed, even had the Insureds displayed symptoms warranting TCD, in a legitimate clinical setting the practitioner would initially administer a transcranial doppler study of the intracranial arteries, billed using CPT 93886, and would only proceed to perform a vasoreactivity test, billed using CPT 93890, or a microemboli study, billed using CPT 93892 if the Insured displayed symptomology warranting that additional testing. Nevertheless, the Providers purported to provide all three studies on every Insured who received TCD.

139.   In further keeping with the fact that the TCD results were unreliable and useless, the data generated as a result of the TCD appear to have been fabricated.

140.   Specifically, the TCD performed by the Providers generated "TCD Exam Data", an example of which is contained below:

**TCD Exam Data:**
(In the report, the unit of Peak/Mean/Dias is cm/s, Depth's unit is mm, others have no unit)

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|--------|-------|------|------|------|------|------|------|------|------|---------|
| RMCA | 52 | 64 | 41 | 30 | 0 82 | 0.53 | 0.46 | 2.13 | 125 | Toward |
| RACA | 62 | 63 | 42 | 31 | 0.77 | 0.51 | 0 36 | 2.03 | 160 | Reverse |
| RPCA | 67 | 62 | 41 | 31 | 0.75 | 0.50 | 0 59 | 2 00 | 122 | Toward |
| LMCA | 52 | 69 | 42 | 28 | 0 98 | 0.59 | 0 46 | 2.46 | 155 | Toward |
| LACA | 62 | 66 | 45 | 34 | 0.72 | 0.48 | 0.59 | 1.94 | 146 | Reverse |
| LPCA | 67 | 70 | 45 | 32 | 0 85 | 0.54 | 0.04 | 2.19 | 125 | Toward |
| ROA | 47 | 36 | 21 | 13 | 1.11 | 0 64 | 0.41 | 2.77 | 195 | Toward |
| LOA | 47 | 43 | 22 | 11 | 1.48 | 0.74 | 0.64 | 3.91 | 170 | Toward |
| RVA | 62 | 66 | 45 | 35 | 0.68 | 0.47 | 0.61 | 1.89 | 195 | Reverse |
| LVA | 62 | 62 | 41 | 31 | 0.75 | 0.50 | 0.38 | 2.00 | 132 | Reverse |
| BA | 75 | 63 | 43 | 33 | 0.70 | 0.48 | 0.38 | 1.91 | 155 | Reverse |
| vmr pre | 52 | 67 | 44 | 32 | 0.80 | 0.52 | 0.01 | 2.09 | 155 | Toward |
| vmr hold | 52 | 57 | 38 | 29 | 0.73 | 0.49 | 0.60 | 1.97 | 132 | Toward |
| vmr after | 52 | 66 | 44 | 33 | 0.75 | 0.50 | 0.42 | 2.00 | 132 | Toward |
| hits | 52 | 65 | 40 | 28 | +0 92 | 0.57 | 0.05 | 2 32 | 170 | Toward |

**TCD Conclusion:**

141. The "depth" measurement contained in the "TCD Exam Data" purports to measure the size of each Insured's head, as well as the location of blood vessels therein.

142. However, the great majority of Insureds that underwent TCD with Emote Medical or Pitch Medical purportedly had identical depth measurements. In other words, according to the data generated by the Defendants, most Insureds who treated with Emote Medical or Pitch Medical had identically sized heads with identically located blood vessels. For example:

(i)    On July 24, 2021, an Insured named Peyton Atteloney was involved in a motor vehicle accident. On August 10, 2021, PA received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(ii)   On February 28, 2021, an Insured named Ashley Maiorana was involved in a motor vehicle accident. On August 18, 2021, AM received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(iii)  On June 12, 2021, an Insured named Richard Brown was involved in a motor vehicle accident. On August 10, 2021, RB received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(iv)  On April 25, 2021, an Insured named Menachem Itzchaki was involved in a motor vehicle accident. On September 3, 2021, MI received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(v)  On April 25, 2021, an Insured named Jonathan Yunatanov was involved in a motor vehicle accident. On September 3, 2021, JY received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(vi)  On July 10, 2021, an Insured named Rosalino Gonzalez was involved in a motor vehicle accident. On July 31, 2021, RG received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(vii)  On June 30, 2021, an Insured named Cindy Jeanpaul was involved in a motor vehicle accident. On August 10, 2021, CJ received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(viii)  On May 18, 2021, an Insured named Hailey Kohler was involved in a motor vehicle accident. On August 18, 2021, HK received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(ix)  On June 15, an Insured named Demetrios Kastanis was involved in a motor vehicle accident. On July 14, 2021, DK received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(x)  On July 6, 2021, an Insured named Angel Arroyo was involved in a motor vehicle accident. On August 27, 2021, AA received TCD from Emote Medical. As a result of that TCD, Emote Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(xi)  On December 11, 2021, an Insured named Samiqua Peterson was involved in a motor vehicle accident. On April 5, 2022, SP received TCD from Pitch Medical. As a result of that TCD, Pitch Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(xii)    On March 27, 2022, an Insured named Lucio Castro was involved in a motor vehicle accident. On July 4, 2022, LC received TCD from Pitch Medical. As a result of that TCD, Pitch Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(xiii)    On November 16, 2022, an Insured named Nancy Perry was involved in a motor vehicle accident. On July 4, 2022, NP received TCD from Pitch Medical. As a result of that TCD, Pitch Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(xiv)    On March 4, 2022, an Insured named Yimys Balencia was involved in a motor vehicle accident. On April 4, 2022, TB received TCD from Pitch Medical. As a result of that TCD, Pitch Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(xv)    On March 1, 2022, an Insured named Kurt Allen was involved in a motor vehicle accident. On April 5, 2022, KA Medical generated exam data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

143.    These are only representative examples.

144.    It is extremely improbable – to the point of impossibility – that all of the Insureds who treated with the Providers would present with one of four sets of depth measurements.

145.    Moreover, it is virtually impossible that most Insureds who treated with the Emote Medical or Pitch Medical would present with identical depth measurements.

**5.    The Fraudulent Charges for Extracorporeal Shockwave Therapy at Emote Medical, Pitch Medical, and Khanna Medical**

146.    The Defendants also purported to subject numerous Insureds they "treated" to medically unnecessary extracorporeal shockwave therapy ("ESWT").

147.    The Defendants then billed for ESWT through Emote Medical using CPT code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging technology. Temporary codes may become permanent codes or deleted during updates of the code set.

148.    The Defendants' billing for ESWT through Emote Medical using CPT code 0101T generally resulted in charges of $700.39 for each single ESWT treatment that they purported to provide.

149.    The Defendants typically charged GEICO for three to eighteen sessions of ESWT per Insured, resulting in charges ranging from $2,101.17 to $12,607.02 per Insured.

150.    Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy".

151.    ESWT is a nonsurgical treatment that involves the delivery of high energy shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

152.    During ESWT treatment, the practitioner moves an applicator over a gel-covered treatment area.  As the applicator is moved over the treatment area, high energy shock waves that purportedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

153.    Typically, Defendants purportedly performed ESWT treatments on Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain

154.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

155.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.  These clinical approaches are well-established.

156.     By contrast, the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational.

157.     In keeping with the fact that ESWT for the treatment of back, neck, and shoulder pain is not a legitimate treatment option, ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain.

158.     In addition, the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

159.     What is more, there is no legitimate peer reviewed data that establishes the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

160.     In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated care does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

161.    The Defendants' billing for ESWT treatments through the Providers was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to such treatments.

162.    In keeping with the fact that the purported ESWT was provided without regard to the needs of the patient and pursuant to the kickbacks and illegal financial arrangements with the Clinics, the Defendants typically submitted a boilerplate "Shockwave Referral" including a verbatim statement of medical necessity for ESWT along with the Providers' billing, which stated: "Medical Necessity Shockwave Therapy blasts scar tissues which promotes new blood vessels enhancing collagen growth. This promotes tissue repairs and accelerates rapid healing."

163.    However, in many cases, Khanna and the Providers purported to provide ESWT treatments to Insureds soon after their accident and without giving the patients the opportunity to sufficiently respond to conservative physical therapy.

164.    In further keeping with the fact that the purported ESWT was provided without regard to the needs of the patient and pursuant to the kickbacks and illegal financial arrangements with the Clinics, the purported "referrals" virtually always contained illegible marks where the Referring Providers' signature should have been.

165.    These illegible marks made it impossible to discern the actual Referring Provider purportedly recommending that the particular patient received ESWT. In actuality, no medical professional typically recommended that the patient receive ESWT.

166.    Contrary to the Defendants' false representations, the charges for the ESWT treatments were medically unnecessary, part of the Defendants' fraudulent treatment and billing protocol, and designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

167.    Furthermore, the Defendants' charges for the medically unnecessary ESWT also were fraudulent in that the Defendants did not even actually provide high energy ESWT that satisfied the requirements of CPT code 0101T.

168.    Instead, the Defendants actually provided Radial Pressure Wave Therapy.

169.    Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.

170.    Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

171.    In fact, the Defendants utilized a portable, compact radial wave pressure device that does not even purport to be able to provide the high energy capacity necessary to produce a true shock wave.

172.    Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – Emote Medical did not even provide the high energy ESWT treatments, but merely a form of pressure wave therapy that the Defendants fraudulently billed using CPT code 0101T.

173.    In short, the billing for ESWT treatments was part of the Defendants' fraudulent treatment and billing protocol, was designed solely to financially enrich the Defendants, and had absolutely nothing to do with genuine patient care.

**6.      The Fraudulent Charges for Dry-Needling at Emote Medical**

174.    The Defendants purported to subject many Insureds in the claims identified in Exhibit "1" to a series of medically unnecessary "dry needling" sessions.

175.    The Defendants purported to perform and/or provide their putative dry needling in order to treat trigger points in the Insureds, although the Insureds in the claims identified in Exhibit

"1" did not have any legitimate trigger point complaints and did not require any trigger point treatments.

176.    Khanna and Emote Medical virtually always purported to personally administer the dry needling, which the Defendants then billed through the Providers to GEICO as multiple charges of either $100.00 or $75.00 per Insured, per date of service, using CPT code 20999, typically resulting in charges of thousands of dollars per Insured, per date of service, for each session of dry needling the Defendants purported to perform and/or provide.

177.    The charges for the dry needling sessions also were fraudulent in that the dry needling sessions were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent predetermined treatment protocol and the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

### a.    Legitimate Use of Dry Needling

178.    Dry needling is a technique in which a thin filiform needle is used to penetrate the skin and stimulate underlying myofascial trigger points, muscular, and connective tissues.  The technique is used to treat dysfunctions in skeletal muscle, fascia, and connective tissue, diminish persistent peripheral nociceptive input, and reduce impairments of body structure and function.

179.    As set forth above, any legitimate trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

180.    In a legitimate clinical setting, dry needling – like any other type of pain management – should not be administered until a patient has pain symptoms that have persisted

for more than three months and has failed or been intolerant of conservative therapies for at least one month.

181.   This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of days or weeks through conservative treatment, and invasive dry needling entail a degree of risk to the patient that is absent in more conservative forms of treatment.

182.   Moreover, in a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections – including trigger point injections and dry needling – should not be administered simultaneously.

183.   This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

### b.   The Defendants' Medically Unnecessary Dry Needling

184.   However, in the claims for dry needling that are identified in Exhibit "1", the Nominal Owner Defendants and Providers – at the direction of the Management Defendants – routinely purported to subject Insureds to a massive amount of dry needling within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

185.    What is more, in the claims for dry needling that are identified in Exhibit "1", Khanna and Emote Medical often purported to administer dry needling to Insureds prior to determining whether the Insured experienced persistent pain symptoms or failed conservative treatments.

186.    For example:

(i)     On November 15, 2021, an Insured named Elliott Ellis was involved in an automobile accident. Though EE could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to EE on November 16, 2021, one day after the accident.

(ii)    On November 17, 2021, an Insured named Dalyn Hidalgo was involved in an automobile accident. Though DH could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to DH on November 19, 2021, two days after the accident.

(iii)   On November 17, 2021, an Insured named James Benavidesquinayas was involved in an automobile accident. Though JB could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to JB on November 19, 2021, two days after the accident.

(iv)    On October 31, 2021, an Insured named Jeffrey Hill was involved in an automobile accident. Though JH could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to JH on November 9, 2021.

(v)     On October 31, 2021, an Insured named Ryhem Montague was involved in an automobile accident. Though RM could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to RM on November 9, 2021.

(vi)    On October 29, 2021, an Insured named Lexi Herrera was involved in an automobile accident. Though LH could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to LH on November 10, 2021.

(vii)    On November 2, 2021, an Insured named Lisa Soto was involved in an automobile accident. Though LS could not have experienced persistent pain symptoms or failed conservative treatments less than three weeks after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to LS on November 19, 2021.

(viii)    On November 4, 2021, an Insured named Araceli Reyes was involved in an automobile accident. Though AR could not have experienced persistent pain symptoms or failed conservative treatments less than three weeks after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to AR on November 22, 2021.

(ix)    On October 27, 2021, an Insured named Kiani Phoenix was involved in an automobile accident. Though KP could not have experienced persistent pain symptoms or failed conservative treatments less than three weeks after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to KP on November 16, 2021.

(x)    On October 16, 2021, an Insured named Ricardo St. Jean was involved in an automobile accident. Though RSJ could not have experienced persistent pain symptoms or failed conservative treatments less than four weeks after the accident, Khanna and Emote Medical purported to administer more than a dozen dry needling insertions to RSJ on November 9, 2021.

187.    These are only representative examples.

188.    In the dry needling claims identified in Exhibit "1", the Defendants routinely purported to perform and/or provide medically unnecessary dry needling to Insureds within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

189.    The Defendants engaged in this conduct solely in order to maximize the fraudulent billing they could submit, or cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to dry needling.

190.    The Defendants purported to perform and/or provide these medically unnecessary dry needling sessions because their focus was on generating profit, rather than on patient care.

**B.      Emote Medical and Pitch Medical's Fraudulent Billing for Services Provided by Independent Contractors**

191.    The Defendants' fraudulent scheme also included submission of bills to GEICO seeking payment for services performed by independent contractors.

192.    Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

193.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); and DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society). Copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "4".

194.    At all relevant times, the bills submitted by Emote Medical and Pitch Medical included charges for services that were provided by persons having no employment relationship with either professional corporation.

195.    At all relevant times, Emote Medical and Pitch Medical never had any neurologists on staff who were actual employees of the professional corporations.

196.    Roy Shanon, M.D. ("Dr. Shanon") is identified as the reading neurologist on numerous reports submitted to GEICO by Emote Medical. However, Dr. Shanon was an independent contractor, not an employee, of Emote Medical.

197.    Dr. Shanon maintained non-exclusive relationships with Emote Medical and contemporaneously performed services on behalf of many other medical practices, some of which were in direct competition with Emote Medical.

198.    For example, Emote Medical billed GEICO for neurology services performed by Dr. Shanon, while at the same time GEICO received bills for services performed by Dr. Shanon at several other neurology practices that are in direct competition with Emote Medical.

199.    During the time when he was purportedly employed by Emote Medical, Dr. Shanon was also working with the following providers:

> (i)      Healthcare Medical Services, P.C.
>
> (ii)     Regal Diagnostics, LLC
>
> (iii)    Daniel Shapiro, M.D.
>
> (iv)     Lifeline Medical Imaging, P.C.
>
> (v)      Hillside Primary Medical Care, P.C.
>
> (vi)     Community Medical Care of NY, P.C.

200.    Similarly, Omar Ahmed, M.D. ("Dr. Ahmed") is identified as the reading neurologist on numerous reports submitted to GEICO by Pitch Medical. However, Dr. Ahmed was an independent contractor, not an employee, of Pitch Medical.

201.    Dr. Ahmed maintained non-exclusive relationships with Pitch Medical and contemporaneously performed services on behalf of other medical practices, some of which were in direct competition with Pitch Medical.

202.    For example, Pitch Medical billed GEICO for neurology services performed by Dr. Ahmed, while at the same time GEICO received bills for services performed by Dr. Ahmed at several other neurology practices that are in direct competition with Pitch Medical.

203.    During the time when he was purportedly employed by Pitch Medical, Dr. Ahmed was also working with the following providers:

(i)  Alan Beckles, M.D.

(ii)    Modern Brooklyn Medical, PC

(iii)   ASM Diagnostic, Inc.

(iv)    East Coast Medical Care, P.C.

(v)    JPB Richmond Medical Care, P.C.

(vi)    Queens Medical Diagnostic P.C.

(vii)   Seneca Medical P.C.

(viii)  SMB Medical PC

204.    By electing to treat the healthcare professionals as independent contractors rather than employees, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the health care professionals.

205.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of Emote Medical or Pitch Medical to make it appear as if the services were eligible for reimbursement.

206.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

207.    Because Dr. Shanon was an independent contractor when he performed the Fraudulent Services, Emote Medical never had any right to bill or collect No-Fault Benefits in connection with those services.

208.    Similarly, because Dr. Ahmed was an independent contractor when he performed the Fraudulent Services, Pitch Medical never had any right to bill or collect No-Fault Benefits in connection with those services.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

209.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the

Providers to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

210.    The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of the Providers were false and misleading in the following material respects:

(i)     The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Providers uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Providers uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements amongst the Defendants and others.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Providers uniformly misrepresented to GEICO that the Providers were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, The Providers were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were rendered by independent contractors as opposed to the Providers' employees.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Providers uniformly fraudulently concealed the fact that the Providers are professional corporations operating in violation of material licensing laws in that they are medical professional corporations nominally owned by physicians who do not actually practice medicine through the professional corporations.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

211.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

212.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

213.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Providers in an effort to prevent discovery of the fact that the Providers unlawfully exchanged kickbacks for patient referrals.

214.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Providers unlawfully exchanged kickbacks for patient referrals.

215.    Furthermore, the billing and supporting documentation submitted by the Providers for the Fraudulent Services, when viewed in isolation, did not reveal its fraudulent nature.

216.    Nevertheless, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

217.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the health care professionals associated with the Emote Medical and Pitch Medical in order to prevent GEICO from discovering that the health care professionals performing many of the Fraudulent Services were not employed by the Providers.

218.    The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

219.     The Defendants' collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

220.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1.3 million based upon the fraudulent charges.

221.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

222.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

223.     There is an actual case in controversy between GEICO and the Defendants regarding approximately $2.1 million in fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the names of the Providers.

224.     Specifically, there is approximately $1,694,221.68 in pending fraudulent billing from Emote Medical, $102,516.74 in pending fraudulent billing from Pitch Medical, and approximately $317,424.52 in pending fraudulent billing from Khanna Medical.

225.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

226.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants, and others.

227.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Providers because, in many cases, the Fraudulent Services were provided by independent contractors, rather than by employees of Emote Medical, Pitch Medical, or Khanna Medical.

228.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)      The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Providers because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Providers because the Fraudulent Services, in many cases, never were provided in the first instance;

(iii)    The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Providers because the billing

codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Providers because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Defendants and others; and

(v)      The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of under the names of the Providers because, in many cases, the Fraudulent Services were provided by independent contractors, rather than by employees of the Providers.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
**Against Khanna**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

229.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

230.    Emote Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

231.    Khanna knowingly have conducted and/or participated, directly or indirectly, in the conduct of Emote Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over fifteen months seeking payments that Emote Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billed for services were not performed at all; (iv) Emote Medical obtained its patients through the Defendants' illegal kickback scheme; and (iv) in many cases, the billed-for services were provided – to the extent provided at all – by independent contractors, rather than by Emote Medical's employees. The fraudulent billings and

corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

232.     Emote Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Khanna operated Emote Medical, inasmuch as Emote Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Emote Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Emote Medical to the present day.

233.     Emote Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Emote Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

234.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $917,786.10 pursuant to the fraudulent bills submitted by the Defendants through Emote Medical.

235.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Khanna and Emote Medical
### (Common Law Fraud)

236.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

237.    Khanna and Emote Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

238.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Emote Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Khanna and Emote Medical; (iii) in every claim, the representation that the billed-for services were provided by employees of Emote Medical, when in fact many of the billed-for services were provided by independent contractors; and (iv) in many claims, the representation that the billed for services were actually performed when in fact that was not the case. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

239.    Khanna and Emote Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Emote Medical that were not compensable under the No-Fault Laws.

240.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $917,786.10 pursuant to the fraudulent bills submitted by Khanna through Emote Medical.

241.    Khanna and Emote Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

242.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Khanna and Emote Medical
### (Unjust Enrichment)

243.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

244.    As set forth above, Khanna and Emote Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

245.    When GEICO paid the bills and charges submitted by or on behalf of Emote Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

246.    Khanna and Emote Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

247.    Khanna and Emote Medical's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

248.    By reason of the above, Khanna and Emote Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $917,786.10.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Khanna
### (Violation of RICO, 18 U.S.C. § 1962(c))

249.    GEICO incorporates, as though fully set forth herein, each and every allegation in
the paragraphs set forth above.

250.    Pitch Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. §
1961(4), that engages in activities which affect interstate commerce.

251.    Khanna knowingly have conducted and/or participated, directly or indirectly, in the
conduct of Pitch Medical's affairs through a pattern of racketeering activity consisting of repeated
violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States
mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for
over five months seeking payments that Pitch Medical was not eligible to receive under the No-Fault
Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services
were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol
designed solely to enrich Defendants; (iii) the billed for services were not performed at all; (iv)
Pitch Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in
many cases, the billed-for services were provided – to the extent provided at all – by independent
contractors, rather than by Pitch Medical's employees. The fraudulent billings and corresponding
mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified
through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

252.    Pitch Medical's business is racketeering activity, inasmuch as the enterprise exists
for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the
regular ways in which Khanna operated Pitch Medical, inasmuch as Pitch Medical never was eligible
to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for
Pitch Medical to function. Furthermore, the intricate planning required to carry out and conceal the

predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Pitch Medical to the present day.

253.    Pitch Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Pitch Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

254.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $122,900.29 pursuant to the fraudulent bills submitted by the Defendants through Pitch Medical.

255.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against Khanna and Pitch Medical**
**(Common Law Fraud)**

256.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

257.    Khanna and Pitch Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

258.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Pitch Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients

through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Khanna and Pitch Medical; (iii) in every claim, the representation that the billed-for services were provided by employees of Pitch Medical, when in fact many of the billed-for services were provided by independent contractors; and (iv) in many claims, the representation that the billed for services were actually performed when in fact that was not the case The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

259.    Khanna and Pitch Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Pitch Medical that were not compensable under the No-Fault Laws.

260.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $122,900.29 pursuant to the fraudulent bills submitted by Khanna through Pitch Medical.

261.    Khanna and Pitch Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

262.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Khanna and Pitch Medical
### (Unjust Enrichment)

263.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

264.    As set forth above, Khanna and Pitch Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

265.    When GEICO paid the bills and charges submitted by or on behalf of Pitch Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

266.    Khanna and Pitch Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

267.    Khanna and Pitch Medical's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

268.    By reason of the above, Khanna and Pitch Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $122,900.29.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Khanna
### (Violation of RICO, 18 U.S.C. § 1962(c))

269.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

270.    Khanna Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

271.    Khanna knowingly have conducted and/or participated, directly or indirectly, in the conduct of Khanna Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over fifteen months seeking payments that Khanna Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-

services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billed for services were not performed at all; (iv) Khanna Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent provided at all – by independent contractors, rather than by Khanna Medical's employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

272.    Khanna Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Khanna operated Khanna Medical, inasmuch as Khanna Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Khanna Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Khanna Medical to the present day.

273.    Khanna Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Khanna Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

274.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $286,521.83 pursuant to the fraudulent bills submitted by the Defendants through Khanna Medical.

275.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
### Against Khanna and Khanna Medical
### (Common Law Fraud)

276.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

277.     Khanna and Khanna Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

278.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Khanna Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Khanna and Khanna Medical;  (iii) in every claim, the representation that the billed-for services were provided by employees of Khanna Medical, when in fact many of the billed-for services were provided by independent contractors ; and (iv) in many claims, the representation that the billed for services were actually performed when in fact that was not the case. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

279.    Khanna and Khanna Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Khanna Medical that were not compensable under the No-Fault Laws.

280.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $286,521.83 pursuant to the fraudulent bills submitted by Khanna through Khanna Medical.

281.    Khanna and Khanna Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

282.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A TENTH CAUSE OF ACTION**
**Against Khanna and Khanna Medical**
**(Unjust Enrichment)**

283.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

284.    As set forth above, Khanna and Khanna Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

285.    When GEICO paid the bills and charges submitted by or on behalf of Khanna Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

286.    Khanna and Khanna Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

287.     Khanna and Khanna Medical's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

288.     By reason of the above, Khanna and Khanna Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $286,521.83

## JURY DEMAND

289.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Providers have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of action against Khanna, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $917,786.10, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Emote Medical and Khanna, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $917,786.10, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

D.      On the Fourth Cause of Action against Emote Medical and Khanna, more than $917,786.10 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper.

E.      On the Fifth Cause of action against Khanna, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $122,900.29, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Pitch Medical and Khanna, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $122,900.29, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

G.      On the Seventh Cause of Action against Pitch Medical and Khanna, more than $122,900.29 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

H.      On the Eighth Cause of action against Khanna, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $286,521.83, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Khanna, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $286,521.83, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

J.      On the Tenth Cause of Action against Emote Medical and Khanna, more than $286,521.83 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       October 31, 2022

RIVKIN RADLER LLP

By:    /s/ *Barry I. Levy*
       Barry I. Levy (BL 2190)
       Michael A. Sirignano (MS 5263)
       Joshua D. Smith (JS 3989)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

**A.**